# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

v.

ALEKSANDER ALEKSOV,

   Defendant.

**Criminal No. 11-23 (CKK)**

## MEMORANDUM OPINION
(December 20, 2012)

Defendant Aleksander Aleksov was arrested on January 29, 2008 and charged with knowingly and willfully threatening to kill and inflict bodily harm upon President George W. Bush in violation of 18 U.S.C. § 871. Compl., ECF No. [1]; Indictment, ECF No. [24]. After a competency evaluation, the Court found the Defendant not competent to stand trial. The Defendant was detained at the Federal Medical Center in Butner, North Carolina in hopes of restoring his competency. As part of that process, the Court granted the Government's motion to involuntarily medicate the Defendant. Ultimately the Defendant was found competent on February 14, 2011, and entered a plea of not guilty by reason of insanity to violating section 871 on June 6, 2011.

Presently before the Court is the Defendant's [40] Motion to Modify Conditions of Release, seeking the Defendant's release into the community under certain conditions. The Government and the Risk Assessment Panel at FMC Butner oppose the Defendant's release from confinement. The Court held an evidentiary hearing on March 8, 14, and 20, 2012. Having considered the evidence presented during the evidentiary hearing, the parties' proposed findings of fact and conclusions of law, the relevant authorities, and the record as a whole, the Court finds

that even with the proposed conditions of release, the Defendant's release would create a substantial risk of bodily injury due to a present mental disease or defect. Therefore, the Defendant's motion to modify his conditions of release is DENIED WITHOUT PREJUDICE.

# I. FINDINGS OF FACT[1]

The following Findings of Fact are based on the testimony and evidence presented by the parties during the evidentiary hearing, the parties' pre-hearing and post-hearing pleadings,[2] and the record as a whole. The Court credits the following evidence after reviewing the complete record, observing the demeanor of the witnesses, considering the arguments of counsel, and drawing all reasonable inferences from the evidence.

## A. Procedural History

The Defendant was arrested on January 29, 2008 and charged by complaint with knowingly and willfully threatening to kill and inflict bodily harm upon President George W. Bush in violation of 18 U.S.C. § 871. On February 6, 2008, the Defendant was committed to the United States Attorney General for a full mental health evaluation. 2/06/08 Minute Entry. During a competency hearing on May 19, 2008, Magistrate Judge Alan Kay determined that the Defendant was not competent to stand trial, and committed the Defendant for treatment and further psychiatric evaluation. 5/19/08 Minute Entry; 6/19/08 Order, ECF No. [6], at 1. The Court subsequently granted the Government's motion to involuntarily medicate the Defendant on

_____

[1]  Findings of Fact may also be contained in the section entitled "Conclusions of Law," and vice versa. The substance of the finding or conclusion, rather than the characterization by the Court, controls.

[2]  Def.'s Mot. to Modify Conditions of Release, ECF No. [40]; Gov't's Opp'n, ECF No. [41]; Def.'s Notice of Expert Report, ECF No. [47]; Def.'s First Suppl. Pet. for Conditional Release, ECF No. [53]; Def.'s Notice of Experts, ECF No. [56]; Def.'s Second Suppl. Pet. for Conditional Release, ECF No. [62]; Gov't's Proposed Findings of Fact & Conclusions of Law, ECF No. [63]; Def.'s Suppl., ECF No. [64].

May 7, 2009.  05/07/09 Order, ECF No. [14]; 5/21/09 Order, ECF No. [17].

The Grand Jury returned an indictment charging the Defendant with one count of violating 18 U.S.C. § 871 on January 27, 2011.  The Court found the Defendant competent on February 14, 2011, and the Defendant entered a plea of not guilty by reason of insanity to count one of the Indictment on June 6, 2011.  2/14/11 Minute Entry; 6/6/11 Minute Entry.  The Court ordered the Federal Medical Center to submit a report regarding the Defendant's mental illness and risk of bodily injury as required by 18 U.S.C. § 4243(b).  6/21/11 Order, ECF No. [36].  The Defendant's treating doctors at FMC Butner, Adeirdre Stribling Riley, Ph.D., and Ralph Newman, M.D., submitted a report dated July 7, 2011, concluding that the Defendant was suffering from a mental disease or defect and would present a substantial risk of bodily injury to another person if released.  *See* Gov't's Opp'n at 5; 7/25/11 Minute Entry.  Two days later, the Defendant filed the present motion.

Pursuant to 18 U.S.C. § 4243(c), on July 25, 2011, the Court held a hearing in order to determine whether or not he should be committed to the custody of the Attorney General.  The Court agreed with the July 7, 2011 report from Dr. Stribling Riley and Dr. Newman that the Defendant posed a substantial risk of bodily injury due to a present mental disease or defect if released, and held that the Defendant should remain committed.  7/25/11 Minute Entry. However, with the Defendant's motion outstanding, the Court did not enter a written order under section 4243(e), and thus FMC Butner did not adopt a formal treatment plan for the Defendant.

The Defendant was transferred from the Federal Medical Center at Butner to the D.C. Jail on October 15, 2011.  *See* 3/20/12 Tr. 6:13-16.  Prior to the Defendant's arrival in the District of Columbia, his counsel was unable to arrange a specific conditional release proposal with service providers in the District of Columbia.  Accordingly, the Court delayed the evidentiary hearing on

the Defendant's motion until a proposal for the Defendant's release was finalized. The Defendant's treatment team at FMC and Butner oppose the Defendant's release even under the plan designed for the Defendant after his transfer to the D.C. Jail.

The Court held an evidentiary hearing regarding the Defendant's motion over the course of three days in March 2012. During the first day of testimony, March 8, 2012, four witnesses testified on behalf of the Defendant: (1) Dr. Paul Montalbano, a forensic psychologist;[3] (2) Dr. Robert Keisling, a psychiatrist;[4] (3) Dr. Benjamin Adewale, the Defendant's treating psychiatrist at the D.C. Jail;[5] and (4) Iva Aleksova, the Defendant's sister. The hearing resumed on March 13, 2012, at which time Ms. Aleksova concluded her testimony, and Dr. Adeirdre Stribling Riley[6] testified on behalf of the Government. Dr. Stribling Riley concluded her testimony on

_____

[3] Dr. Montalbano is the Deputy Chief of the Forensic Post-Doctoral Psychology Program, part of the Center for Forensic Behavioral Sciences, which serves the Department of Defense. 3/8/12 Tr. 12:18-22. Without objection, the Court certified Dr. Montalbano as an expert in the diagnosis and treatment of mental disorders. *Id*. at 13:12-20. Dr. Montalbano met with the Defendant three different times in January and February 2012 for a total of nine hours. *Id.* at 14:3-8. Dr. Montalbano also reviewed various documents relating to this case and spoke to relevant individuals connected to the Defendant's case. *Id.* at 14:11-22.

[4] Dr. Keisling is a psychiatrist with Pathways to Housing, a mental health organization that provides housing and mental health services to homeless and mentally ill individuals. 3/8/12 Tr. 82:24-83:4. Without objection, the Court certified Dr. Keisling as an expert in the diagnosis and treatment of mental illness. *Id.* at 84:4-13. Dr. Keisling met with the Defendant at FMC Butner in August 2011 and at the D.C. Jail in January 2012. *Id.* at 84:24-85:5. Dr. Keisling also reviewed various documents relating to this case and spoke to relevant individuals connected to the Defendant's case. *Id.* at 85:5-12.

[5] Dr. Adewale was the Defendant's treating psychiatrist at the D.C. Jail. 3/8/12 Tr. 5:7-10. Without objection, the Court certified Dr. Adewale as an expert in the diagnosis and treatment of mental illness. *Id.* at 143:6-8. Prior to his testimony, Dr. Adewale also reviewed Dr. Montalbano's and Dr. Stribling Riley's expert reports, as well as other documents relevant to the Defendant's case and conducted relevant interviews. *Id.* at 143:20-144:16.

[6] Dr. Stribling Riley is a psychologist with FMC Butner. Without Objection, the Court certified Dr. Stribling Riley as an expert in the diagnosis and treatment of mental disorders. 3/13/12 Tr. 16:21-17:1. Dr. Stribling Riley has conducted several evaluation of the Defendant,

March 20, 2012, and the Defendant briefly called Dr. Montalbano in rebuttal. At the conclusion

of the hearing, the Court requested a report from the United States Probation Office regarding the

viability of the conditional release plan proposed by the Defendant,[7] as well as proposed findings

of fact and conclusions of law from the parties. The parties filed their post-hearing briefs on

May 14, 2012.

### B.  Defendant's Background

The Defendant, now thirty three years old, was born and raised in Macedonia. *See* 3/8/12

Tr. 186:20-21, 189:9-190:14 (I. Aleksova); *see also id.* at 189:9-23 (noting the Defendant

obtained a college degree before moving to the United States). As part of the diversity lottery

process, the Defendant obtained a visa and green card permitting him to travel to and reside

permanently in the United States. 3/8/12 Tr. 192:14-19 (I. Aleksova). The Defendant moved to

the United States in 2005, and for the most part resided with his sister until the time of his arrest.

3/13/12 Tr. 3:25-4:21 (I. Aleksova). The Defendant claimed to have worked in the real estate

industry during this time frame, but this claim has not been independently verified. 3/20/12 Tr.

56:16-25 (A. Stribling Riley). Prior to his arrest, the Defendant had never been diagnosed with

or treated for mental illness. Nor did the Defendant disclose his hallucinations or delusions to

his sister. 3/13/12 Tr. 5:23-25 (I. Aleksova). The Defendant displayed unusual behavior prior to

his arrest in connection with this case, including leaving a voicemail for his mother indicating he

wanted to drink her blood. 3/13/12 Tr. 27:12-16 (A. Stribling Riley). It now appears that

---

including his initial competency evaluation. *Id.* at 17:7-18 (A. Stribling Riley). In preparing her
report in response to the Defendant's motion, Dr. Stribling Riley also reviewed various
documents relating to this case and spoke to relevant individuals connected to the Defendant's
case, including conducting additional interviews with the Defendant. *Id.* at 18:1-12.

[7]  Probation Mem., ECF No. [61].

incident was the result of the Defendant's auditory hallucinations, *id.*, but at the time his family did not recognize the Defendant as being mentally ill.

C.    *Defendant's Mental Health Condition*

1.    Diagnosis and Symptomatology

The Defendant suffers from paranoid schizophrenia. 3/8/12 Tr. 15:9-13 (P. Montalbano); *id.* at 85:13-15 (R. Keisling); 3/13/12 Tr. 24:24-25:1 (A. Stribling Riley). For the Defendant, this condition is characterized primarily by prominent, bizarre delusions, in other words, improbable or absurd fixed false beliefs. 3/8/12 Tr. 15:16-20 (P. Montalbano). These delusions are "persistent" and "well-encapsulated." *Id.* at 48:15. Prior to his arrest in connection with this case, the Defendant suffered from visual and auditory hallucinations: distortions in the perception of reality. 3/13/12 Tr. 27:5-28:16 (A. Stribling Riley); 3/20/12 Tr. 14:9-21 (A. Stribling Riley). It does not appear the Defendant has suffered from hallucinations since his arrest. 3/8/12 Tr. 16:9-17:15, 78:2-5 (Montalbano); 3/13/12 Tr. 27:5-28:16 (A. Stribling Riley); 3/20/12 Tr. 14:9-21 (A. Stribling Riley). Despite anti-psychotic medication, the Defendant remains "actively psychotic." 3/8/12 Tr. 63:9-13 (P. Montalbano). Paranoid schizophrenia generally has a better prognosis than other forms of schizophrenia, "particularly with regard to occupational functioning and capacity for independent living." 3/20/12 Tr. 15:1-5 (A. Stribling Riley). In all likelihood, the Defendant will continue to suffer from paranoid schizophrenia for the rest of his life. 3/8/12 Tr. 59:12-17 (P. Montalbano); *id.* at 87:1-8 (R. Keisling).

In general terms, the Defendant's delusional system "involves various individuals changing their identity, morphing into other people, both physically and psychologically, changing their skin, all in an effort to persecute him," which, according to the Defendant, has been happening for the past 500 years. 3/13/12 Tr. 19:6-10 (A. Stribling Riley). The

6

Defendant's delusions generally fall into three categories: (1) his belief that he is being persecuted and harassed by Satan; (2) his belief that individuals are not who they say they are or morph into other people ("misidentification" delusion); and (3) his belief that individuals, including Satan, can control the Defendant's thoughts and/or behavior. 3/8/12 Tr. 44:23-45:4 (P. Montalbano).

In terms of the first category of delusion, the Defendant reported that he is the reincarnation of historic individuals, including Alexander the Great. 3/13/12 Tr. 19:11-14 (A. Stribling Riley). Because of his historical importance, the Defendant believes Satan—whom the Defendant sometimes interchanges with his grandfather—is jealous of the Defendant and persecutes him. *Id.* The Defendant reported meeting Satan in Greece in 1999. 3/8/12 Tr. 53:17-23 (P. Montalbano). The Defendant believes that Satan has ruined every one of the Defendant's relationships, and that Satan can make "doubles" of people, cut off their heads, and use their faces to make masks. 3/8/12 Tr. 54:2-5, 19-25 (P. Montalbano). The Defendant further believes that Satan trained him to be an assassin. 3/20/12 Tr. 52:6-7 (A. Stribling Riley).

The Defendant also incorporates individuals in his environment into his delusions. While at FMC Butner, the Defendant incorporated other inmates into his delusions, believing various inmates to be the reincarnations of Moses, John the Baptist, and other historical figures. 3/8/12 Tr. 130:4-10 (R. Keisling). The Defendant indicated to Dr. Montalbano that he believed President Bush was his second cousin, and that President Bush "at one point was George Washington in a previous reincarnation." 3/8/12 Tr. 37:18-24 (P. Montalbano). The Defendant also incorporated Dr. Stribling Riley and Dr. Maureen Reardon, another psychologist at FMC Butner, into his delusion. 3/20/12 Tr. 18:10-14 (A. Stribling Riley); *see also* 3/13/12 Tr. 25:18-23 (noting that as recently as February 22, 2012, the Defendant believed he and Dr. Stribling

Riley had a child together named Gary Junker, who is the chief psychologist at FMC Butner).

Perhaps most significantly for purposes of this motion, the Defendant's delusional system includes the belief that individuals, particularly Satan, can control the Defendant's thoughts and actions. *See, e.g.*, 3/8/12 Tr. 61:24-25:2 (P. Montalbano) (explaining the Defendant is suspicious and mistrustful of others, believing they are trying to influence or control him). The Defendant explained to Dr. Montalbano that he believes Satan made the Defendant use drugs and steal money from his family. 3/8/12 Tr. 55:17-19 (P. Montalbano); *see also id.* at 62:3-5 (noting the Defendant tends to blame "external forces" for his problems). The Defendant explained to Dr. Stribling Riley that, with respect to the incident that led to his arrest in this case,

> He expressed having no control over being able to carry out th[e] threat. He was ordered to do so by Satan. So, while he expressed no specific internal intent, he had delusions of being persecuted by Satan. And this individual hypnotized him and in some way he could not control his actions based on what he was directed to do.

3/20/12 Tr. 33:6-11 (A. Stribling Riley).

Mr. Aleksov is willing to discuss his delusions with his mental healthcare providers, but he does not recognize them as delusions. 3/8/12 Tr. 73:17-74:6 (P. Montalbano). The Defendant has no insight into his mental illness and does not believe he is mentally ill. 3/8/12 Tr. 35:7-10 (P. Montalbano). The Defendant has reported changing his belief regarding certain delusions; for example, the Defendant reported to Dr. Montalbano that although he once thought his attorney Mr. Anthony was not who he said he was, the Defendant now recognizes Mr. Anthony is his defense attorney. 3/8/12 Tr. 75:13-24. However, the Defendant has never wavered in his beliefs regarding Satan and his assertion that he is not mentally ill. *Id.* at 75:17-24. Historically—including in the context of the offense in question—certain "triggers" led the Defendant to act on his delusional beliefs. The Defendant has improved his ability to *not* act in

response to such triggers, but continues to struggle with the impulses.  3/13/12 Tr. 62:8-63:4 (A. Stribling Riley).

        2.   <u>Treatment</u>

Prior to his arrest in 2008, the Defendant was not receiving any mental health treatment for his condition.  Since the Court authorized the involuntary medication of the Defendant, with some variation over time, the Defendant has received biweekly injections of 50 milligrams of Risperdal Consta, later combined with biweekly injections Prolixin Decanoate.  3/8/12 Tr. 86:1-6 (R. Keisling); 3/20/12 Tr. 3:25-4:24 (A. Stribling Riley).[8]  At the D.C. Jail, the Defendant takes 5 milligrams of Haldol by mouth daily.  3/8/12 Tr. 86:1-6 (R. Keisling).  The Defendant has generally complied with his medication requirements once ordered to by the Court.  3/8/12 Tr. 53:2-5 (Montalbano); 3/20/12 Tr. 5:3-6:9 (A. Stribling Riley).  However, the Defendant is constantly negotiating regarding his medication, seeking to either stop or reduce the medication.  3/20/12 Tr. 41:7-13 (A. Stribling Riley).  When transferred to the D.C. Jail, the Defendant initially refused to take the new anti-psychotic prescribed to him (Abilify) when the Jail did not have Risperdal Consta available.  3/8/12 Tr. 146:23-147:4 (Adewale).  Since that initial incident, the Defendant has been compliant with his medication while housed at the D.C. Jail.  *Id.* at 147:9-19.  The Defendant remains delusional, but appears less agitated, more stable, and less pre-occupied with his delusions since beginning anti-psychotic medication.  3/8/12 Tr. 49:21-25 (P. Montalbano); 3/20/12 Tr. 16:3-7 (A. Stribling Riley).

The Court had not ordered the Defendant to participate in any additional treatment or

---

    [8]  The dosage of the Risperdal Consta and Prolixin Decanoate have varied somewhat overtime as the Defendant's care team has sought to balance the need for a therapeutic dose with the side effects of the medication.  *E.g.*, 3/8/12 Tr. 85:24-86:6 (R. Keisling); 3/20/12 Tr. 3:25-4:24 (A. Stribling Riley).

therapies available at FMC Butner. Due to the procedural posture of the Defendant's case, FMC Butner had yet to design and implement a complete and formal treatment plan for the Defendant before he was transferred to the D.C. Jail in connection with his motion. *See supra* at 3; 3/20/12 Tr. 21:11-16. Nevertheless, numerous therapeutic groups and programs were available to the Defendant, but the Defendant thus far has not participated in any treatment beyond taking his medication as ordered by the Court. 3/8/12 Tr. 64:21-65:2 (P. Montalbano). The Defendant typically did not socialize with other inmates at FMC Butner. 3/13/12 Tr. 29:1-25 (A. Stribling Riley). The Defendant also refused to sign any treatment plans offered to him. 3/8/12 Tr. 60:8-12 (P. Montalbano). The Defendant's motivation to comply with the medication requirement is solely to enable his release from confinement; he does not believe that he needs anti-psychotic medication. *Id.* at 35:21-25; *see also id.* at 49:3-5 (agreeing that the Defendant does not want to participate in a day program if conditionally released). Given the Defendant's lack of insight into his illness and need for medication, Dr. Keisling recommends administering the Defendant's anti-psychotic medications by injection upon his release to ensure compliance. 3/8/12 Tr. 86:19-21.

### 3. Value of Continued Confinement

The Defendant may never have full insight into his mental illness, but there is hope that in time he may come to appreciate the value of treatment. 3/8/12 Tr. 71:2-11 (P. Montalbano). Numerous therapeutic programs are available to the Defendant at FMC Butner, including a mental health community group, recreational group, educational programming, vocational rehabilitation programs, and drug abuse treatment. 3/13/12 Tr. 30:3-10, 33:19-24 (A. Stribling Riley). The mental health community group in particular may help the Defendant insofar as it would challenge the Defendant's delusional system, educate him regarding the risks and benefits

of education, and the importance of complying with his medication; in other words, help the Defendant become an "active member of [his] treatment team." *Id.* at 31:4-22 (A. Stribling Riley); *see also* 3/20/12 Tr. 17:22-18:2 (noting the mental health community group would help the Defendant learn to cope with individuals in society) (A. Stribling Riley). Programs like the vocational rehabilitation program, which employs the inmates for specific purposes (e.g., repairing wheelchairs, making copies, etc), enables the inmates to interact with each other, and be held accountable for arriving at work at a certain time. 3/13/12 Tr. 34:5-25 (A. Stribling Riley). Even if the Defendant does not develop further insight into his illness, participation in therapeutic groups and occupational training at FMC Butner "would help [the Defendant] to engage in appropriate pro-social behavior that would demonstrate some ability to control his impulses and not act out on his delusions." 3/20/12 Tr. 19:1-4 (A. Stribling Riley).

> D.    *Risk of Violence*

The evidence presented to the Court regarding the Defendant's risk of violence falls into two categories: (1) clinical assessments of the Defendant's potential for violent behavior; and (2) the Defendant's previous behavior. Although independently useful, both of these categories when evaluated in combination with other evidence best inform the Court's evaluation of the Defendant's potential to create a risk for bodily injury.

> 1.    <u>Clinical Assessments</u>

Dr. Montalbano and Dr. Stribling Riley each administered a number of clinical assessments to the Defendant in order to determine his risk of violence if conditionally released. The Court will not belabor the specifics of each assessment; in the end, the results obtained by both experts were substantially similar. First, both experts administered the Psychopathy Checklist Revised. Dr. Montalbano and Dr. Stribling Riley both found that the Defendant scored

in the "low range," reflecting the fact that the Defendant is not a psychopath, although he is psychotic. 3/13/12 Tr. 45:6-22 (A. Stribling Riley). Second, the experts administered the Violence Risk Appraisal Guide, or VRAG, an actuarial measure of the risk of future violence. Both experts scored the Defendant in the fourth of nine bins, indicating that he has a moderately low statistical risk of reoffending: 17% likelihood of recidivism after 17 years. 3/8/12 Tr. 19:22-20:25 (P. Montalbano); 3/13/12 Tr. 47:8-12 (A. Stribling Riley). Third, the experts administered the Historical, Clinical, Risk Management-20 ("HCR-20"), which includes twenty variables empirically validated for association with a risk of violence. 3/13/12 Tr. 47:13-17 (A. Stribling Riley). Despite differences in total scoring,[9] the overall assessment offered by Dr. Montalbano and Dr. Stribling Riley based on the HCR-20 was that the Defendant presents a moderate risk of engaging in any violence, and a high risk for engaging in behavior similar to the offense that led to his arrest in this case, including returning to the White House. 3/13/12 Tr. 55:10-20 (A. Stribling Riley).

Dr. Montalbano also administered the "Minnesota Multiphasic Personality Inventory-2" to the Defendant. 3/8/12 17:20-25 (P. Montalbano). The results of the MMPI-2 indicated the Defendant was extremely elevated on the scale for persecutory ideas, which generally reflects individuals who "tend to view the world as a threatening place, feel persecuted, controlled or manipulated by forces outside of their control." *Id.* at 18:3-10. The testing also suggested

---

[9] During the evidentiary hearing, the Dr. Montalbano criticized Dr. Stribling Riley's use of the clinical assessments in that she described the Defendant as having some issues with substance and alcohol abuse. 3/8/12 Tr. 22:20-23:5, 28:23-29:24 (P. Montalbano). The Defendant self-reported recreational use of illegal drugs before moving to the United States. 3/8/12 Tr. 29:5-9 (P. Montalbano). The Defendant was also inconsistent in his description of his drinking habits. 3/20/12 Tr. 27:3-13 (A. Stribling Riley). Given the Defendant's self-reported drug and alcohol use, the Court finds Dr. Stribling Riley properly considered the Defendant as having an issue with substance abuse, albeit minor.

potential social isolation and mood lability, meaning a tendency to overreact to minor stressors or perceived insults. *Id.* at 18: 11-14. Dr. Montalbano concluded that the Defendant was vulnerable to "real or imagined threats," which could result in dangerous behavior. *Id.* at 61:8-13.

### 2. Dangerous/Violent Behavior

Prior to being treated for mental illness, the Defendant was involved in three incidents that can be described as involving dangerous or violent behavior. First, in December 2007, the Defendant traveled to the White House and got into a scuffle with Secret Service agents. The Defendant was arrested for assaulting an officer, resisting arrest, and interfering with a police officer. 3/8/12 Tr. 57:15-20 (P. Montalbano). The Defendant's sister was in Macedonia for the three months prior to the incident and only returned the day of the Defendant's arrest. 3/13/12 Tr. 4:18-5:1 (I. Aleksova). The Defendant did not disclose his arrest to his sister. *Id.* at 5:5-11.

Second, the Defendant was arrested for the offense at issue in this case—threatening the life of then-President George W. Bush. On January 28, 2008, the Defendant walked from his sister's apartment in Alexandria, Virginia to the White House. The Defendant went up to a secret service agent and stated that he wanted to kill the President. 3/13/12 Tr. 75:5-14 (A. Stribling Riley). The Defendant indicated that Satan had "hypnotized," "instructed," and "commanded," him to go to the White House and kill the President. 3/20/12 Tr. 51:22-25 (A. Stribling Riley). However, the Defendant claims that he has no ill will towards President Bush, and thought he could thwart Satan's plan to kill the President by going to the White House and informing the secret service of Satan's plan. 3/13/12 Tr. 75:5-19 (A. Stribling Riley); *see also* 3/8/12 Tr. 89:25-90:3 (R. Keisling) (indicating that the Defendant claims he "likes George Bush and was forced to do [those] things by Satan").

Third, in February 2008, an urgent care doctor at the D.C. Jail treated the Defendant apparently after an altercation with officers at the Jail. 3/8/12 Tr. 27:8-14 (P. Montalbano). No documentation of the incident exists apart from the doctor's notes, leading Dr. Adewale to speculate that the doctor simply fabricated a reason for treating the Defendant. 3/8/12 Tr. 148:8-150:2 (B. Adewale). There is no apparent motive for the urgent care doctor to have lied about why the Defendant was treated. Therefore the Court credits the record evidence indicating the incident at the Jail in February 2008 took place.

Following his arrest and just weeks after the Court granted the Government's motion to involuntarily medicate the Defendant, in June 2009 the Defendant was sanctioned for threatening a staff member at FMC Butner as he tried to leave the cafeteria through the wrong door. 3/8/12 Tr. 39:8-10 (Montalbano); 3/20/12 Tr. 57:19-24 (A. Stribling Riley).

In late 2008 or early 2009, the Defendant also made a vague, veiled reference regarding President Obama and Osama Bin Laden, but did not elaborate. 3/20/12 Tr. 66:22-67:12 (A. Stribling Riley).

The Defendant was also sanctioned (and his dosage of Risperdal Consta increased) in May 2010 after making a veiled threat against Dr. Reardon, who was pregnant. Dr. Reardon is a psychologist at FMC Butner who was not involved in the Defendant's treatment. 3/13/12 Tr. 20:8-10 (A. Stribling Riley). The Defendant became preoccupied with Dr. Reardon after she walked in on and then exited a clinical interview with the Defendant. 3/20/12 Tr. 49:10-15 (A. Stribling Riley). The Defendant wrote a letter to Dr. Reardon in Macedonian, which ended the line "I'll make you an offer you can't refuse, and I'm dead serious." 3/13/12 Tr. 20:11-24 (A. Stribling Riley). The Defendant subsequently stared inappropriately at Dr. Reardon, to the point it was considered threatening, and the Defendant was moved to a different ward. 3/13/12 Tr.

22:13-24; 3/20/12 Tr. 49:19-50:22 (A. Stribling Riley).  The Defendant continues to incorporate

Dr. Reardon into his delusion, believing he and Dr. Reardon are related in some way.  3/13/12

Tr. 20:22-22:5 (A. Stribling Riley).  As recently as February 22, 2012, the Defendant claimed

that Dr. Reardon was Satan, that she directed Dr. Stribling Riley to diagnose the Defendant with

paranoid schizophrenia, and that she will follow and persecute the Defendant.  *Id*. at 21:13-20.

The Defendant has denied any intent to harm Dr. Reardon.  3/20/12 Tr. 9:17-11:9 (A. Stribling

Riley).  The Defendant also stayed away from Dr. Reardon after being instructed to avoid her.

*Id.* at 11:10-16.

In January 2011, more than eighteen months after the Defendant began taking anti-

psychotic medication, the Defendant reported that he wanted to kill his mother and drink her

blood.  3/8/12 Tr. 55:24-25.  Dr. Montalbano agreed that this reflects dangerous thinking and

potentially dangerous behavior from the Defendant.

E.     *Proposed Conditions for Release*

If conditionally released, the Defendant would reside in a community residential facility

with twenty-four hour per day staffing.  3/8/12 Tr. 90:23-91:4 (R. Keisling).  The Defendant

would be assigned to an "assertive community treatment" team, or ACT team, which provides

intensive outpatient services.  *Id.* at 87:24-88:1.  ACT teams maintain a 10 to 1 ratio of patients

to team members, and are generally comprised of a nurse, psychiatrist, and case managers

(usually social workers) who can meet with the outpatient as often as necessary, even daily.  *Id.*

at 87:25-88:1-6.  The Defendant would be assigned to the Pathways to Housing ACT team,

which has previously provided services to individuals released from prisons and mental

hospitals.  *Id.* at 88:19-24.  The Defendant would also be required to continue taking anti-

psychotic medication.  *Id.* at 91:1-4.

The Defendant would be required to attend a day program at the McClendon Center, but he would not be escorted to the center or otherwise forced to attend by his treatment team. 3/8/12 Tr. 91:5-8 (Keisling); *id.* at 50:17-21 (noting Mr. Aleksov would "have an opportunity to go into the community and not attend his day program") (P. Montalbano).  Dr. Keisling testified that the Defendant would likely be taught to take the bus from the community residential facility to the day program.  *Id.* at 113:22-114:5.  The Defendant would likely be required to stay within a certain radius of the District of Columbia but to stay away from the White House.  *Id.* at 92:7-17.  The McClendon Center is located approximately three blocks from the White House.  *Id.* at 114:14-18.

The Defendant's sister would also serve as a source of support as part of the Defendant's conditional release program.  The Defendant's family, including his sister with whom he primarily lived with for several years prior to the offense at issue, failed to recognize the signs of the Defendant's mental illness or seek help in light of his unusual behavior.  *E.g.*, 3/8/12 Tr. 194:21-196:1; 3/13/12 Tr. 13:19-21 (I. Aleksova).  However, since his arrest and diagnosis, the Defendant's sister has made an effort to educate herself about mental illness and how to provide support for her brother.  3/8/12 Tr. 198:10-200:1 (I. Aleksova).  The support of his sister may, among other things, reduce the Defendant's stress if released into the community.  3/8/12 Tr. 37:1-6 (P. Montalbano).  She may also help encourage the Defendant to take his medication and comply with his treatment program.  3/13/12 Tr. 51:19-25 (A. Stribling Riley).  The Court recognizes the benefits of the involvement of the Defendant's family, but that benefit is somewhat mitigated by the fact that the Defendant's sister resides in Arlington, Virginia and works fulltime while pursuing a master's degree.  3/8/12 Tr. 187:20, 189:7 (I. Aleksova).

The proposed plan is in many respects comprehensive, but it would still be incumbent

upon the Defendant to report to his ACT team any decompensation or if he thought he might be unable to resist acting on violent impulses derived from his delusions. The Defendant stated to the experts that he would tell his ACT team if he received instructions to do something violent. *E.g.*, 3/8/12 Tr. 90:11-19 (R. Keisling). However, the Defendant's judgment is limited in light of his illness, and one can only hope that he would report violent or dangerous delusional thoughts to his ACT team. 3/8/12 Tr. 50:15-16 (P. Montalbano); *id.* at 73:11-20. The Defendant has some recognition of the fact that "if he were to follow some of the directives of Satan, he could well end up interfacing with the legal system or returning to the Bureau of Prisons," but the Defendant's only motivation to comply with the conditions of his release is to avoid confinement. 3/8/12 Tr. 65:9-12, 72:8-21 (P. Montalbano).

## II. CONCLUSIONS OF LAW

The Defendant was committed to FMC Butner after entering his plea of not guilty by reason of insanity pursuant to 18 U.S.C. § 4243(a). The Defendant now moves pursuant to section 4247(h) for his release from commitment. Section 4243(d) provides the relevant burden of proof:

> [A] person found not guilty only by reason of insanity of an offense involving bodily injury to, or serious damage to the property of, another person, or involving a substantial risk of such injury or damage, has the burden of proving by clear and convincing evidence that his release would not create a substantial risk of bodily injury to another person or serious damage of property of another due to a present mental disease or defect. With respect to any other offense, the person has the burden of such proof by a preponderance of the evidence.

The Defendant contends that because his offense did not involve "bodily injury to, or serious damage to the property of, another person," he need only show the lack of substantial risk of bodily injury by a preponderance of the evidence. The only Court of Appeals to address this issue concluded otherwise. *See United States v. Gilgert*, 314 F.3d 506 (10th Cir. 2002). The

Tenth Circuit concluded in *Gilbert* that threats against the President in violation of 18 U.S.C. § 871 *do* involve bodily injury to, or serious damage to the property of, another person because

> [B]eyond any risk a threat against the president may pose to the president directly, such a threat creates a serious risk to those officers, people, and property in the vicinity of the maker of the threat, as well as to the maker of the threat himself, whether competent or not. The risk stems from the potentially extreme reaction by law enforcement officers or ordinary citizens that a threat against our nation's commander-in-chief and chief executive officer threatens to engender. Accordingly, the crime of making a threat against the President of the United States in violation of 18 U.S.C. § 871 necessarily involves a substantial risk of bodily injury to another person or damage to another person's property.

*Id.* at 515. The Court agrees with the Tenth Circuit's analysis of the nature of threats against the President and likewise concludes that the Defendant must demonstrate by clear and convincing evidence that he does not pose a substantial risk of bodily injury to another person.[10] Alternatively, even if the Court were to adopt the Defendant's position, the Court would nevertheless conclude that the Defendant failed to show by a preponderance of the evidence that he does not pose a substantial risk of bodily injury due to a present mental disease.

The Government urges the Court to dismiss the Defendant's motion as premature insofar as it was filed less than 180 days after the Court determined the Defendant should be committed. 18 U.S.C. § 4247(h). To the extent the Defendant's motion was premature when initially filed, more than 180 days have elapsed since the initial commitment decision, and therefore the Court declines to decide the Defendant's motion on that basis. For his part, the Defendant argues his motion should be granted at least in part because his rights have been "eroded" by the time that elapsed between the hearing on his motion and this opinion. Until the Defendant's update regarding the status of his replacement green card, it was not clear that sufficient funding was

---

[10] The parties agree that the Defendant did not pose a substantial risk of injury to the property of another person therefore the Court analyzes only the question of the risk of bodily injury posed by the Defendant in light of his present mental disease.

even available for the Defendant's proposed conditional release plan.  But more importantly, the Court determined upon receipt of the parties' post-hearing briefs that the Defendant had not met his burden and would not be released.  The timing of this opinion had no bearing on the Defendant's rights; he would remain confined at this point regardless.

Based on the complete record before the Court, the Defendant has failed to satisfy his burden of proof.  Apart from the proposed conditional release plan, the Defendant remains actively psychotic and delusional.[11]  The Defendant has no insight into his mental illness. Moreover, the Defendant only takes his medication because it is ordered by the Court, not because he sees a need for it. The Defendant is not motivated to nor does he see a need for participating in *any* mental health treatment.  The Defendant believes he is being persecuted and that Satan can force the Defendant to take actions beyond his control.  Various "triggers" historically have led to the Defendant engaging in dangerous behavior, and the Defendant himself is fearful that he will be unable to control himself if a "trigger" arises in the future. 3/13/12 Tr. 54:9-15, 64:11-13, 66:15-67:2 (A. Stribling Riley).  Even while taking anti-psychotic medications, the Defendant indicated a desire to kill his mother.

The Defendant claims he would contact his ACT team if faced with violent impulses he thought he could not control in order to avoid confinement, but the Defendant's assertion is of questionable validity in light of his psychotic state.   3/8/12 Tr. 51:25-52:3 (P Montalbano). Furthermore, the record indicates that while the Defendant is willing to discuss certain aspects of his delusional system, he is still hesitant to discuss some of his delusional beliefs.   The

---

[11]  Both parties' experts concur that the Defendant presently suffers from a mental illness and continues to exhibit symptoms, primarily in the form of his delusional system.  This is not a case in which the defendant suffers from a mental illness but is asymptomatic.  *Cf.* Gov't's Proposed Findings of Fact & Conclusions of Law at 24.

Defendant continues to struggle not to act on delusional beliefs, and without more, the Court cannot rely on the Defendant to act rationally in response to violent, irrational impulses and beliefs. The only motivation that the Defendant has to comply with the conditions of his release is to avoid further (or renewed) confinement, but the record is far from clear that this motivation is greater than the violent impulses the Defendant suffers due to his mental illness.

The Defendant places great emphasis on the wrap-around services his proposed conditional release plan would provide. The proposed plan is comprehensive, but ultimately relies on the Defendant to: (1) take his medication when necessary, that is, to appear for his injections; and (2) travel to and from a day program the Defendant admittedly does not want to attend. Even in a confined setting the Defendant continues to resist taking any medication by negotiating with Dr. Stribling Riley and subsequently with Dr. Adewale at the D.C. Jail. "[I]f left to his own devices, [the Defendant] would not comply with medication. And when unmedicated, he's extremely impaired." 3/20/12 Tr. 19:23-25 (A. Stribling Riley).

Ultimately the Court is being asked to release the Defendant into the community and to accept that the Defendant will grudgingly comply with the conditions of release because they are court-ordered. The Court's docket would look vastly different if every party that stated an intention to comply with court mandated conditions actually did so. Apart from the Court's experience, the record calls into question the Defendant's assertion that he will comply with any conditions ordered by the Court if only he were released into the community. The Defendant asserts that he is not a child, and does not want to be told what to do. 3/8/12 Tr. 66:3-16 (P. Montalbano). Imposing a program by Court order itself stresses the Defendant, 3/13/12 Tr. 54:18-25 (A. Stribling Riley). There is no evidence to demonstrate that the Defendant recognizes the value of the conditions that would be imposed or otherwise appreciates the

benefits of mental health treatment—which is possible even absent full insight into his mental illness. The record indicates that the Defendant "needs in-patient hospitalization for treatment to be engaged in structured programming before he's released to the community." 3/13/12 Tr. 65:1-3 (A. Stribling Riley). Participation in the therapeutic groups and programs at FMC Butner "would help [the Defendant] to engage in appropriate pro-social behavior that would demonstrate some ability to control his impulses and not act out on his delusions." 3/20/12 Tr. 19:1-3 (A. Stribling Riley). The Defendant's mere assurance that he will comply with the Court's order on the present record is not clear and convincing evidence that he does not pose a substantial risk of bodily injury due to his present mental illness.

The Court appreciates that the Defendant's continued confinement is "stressful" in that it is not where the Defendant wants to be. However, the proposed conditional release plan presents a catch-22: to the extent it is rigid and requires the Defendant to partake in treatment activities he believes are unnecessary, it is likely to cause stress for the Defendant, *see* 3/8/12 Tr. 65:13-15 (P. Montalbano); to the extent it has flexibility the Defendant must choose to comply with the requirements of his release, conditions he believes are unnecessary. Moreover, unknown individuals and new environments stress the Defendant's delusional system, and as the incident with Dr. Reardon indicates, the Defendant may develop threatening fixations with new individuals.

The Court is cognizant of the fact that the Defendant in the past has not caused bodily injury to another person. Nevertheless, for the reasons stated above, the Court finds that the Defendant failed to show by clear and convincing evidence, or alternatively by a preponderance of the evidence, that his conditional release would not create a substantial risk of bodily injury due to a present mental disease or defect. Accordingly, the Defendant's motion to modify

conditions of release is DENIED WITHOUT PREJUDICE. An appropriate Order accompanies

this memorandum opinion.

_____/s/_____
**COLLEEN KOLLAR-KOTELLY**
UNITED STATES DISTRICT JUDGE
